Our second case for this morning is United States v. Jerry Brown v. Frederick Coleman v. Darian Capers v. Nicholas Clark I think we have a couple of people prepared to argue. Mr. Vopel, are you going to be the first? Anthony Vopel Good morning. May it please the court, my name is Anthony Vopel. I was trial counsel for Frederick Coleman and represent him here on appeal today. I'll be arguing the joint issues before the court today. Mr. Bell will be arguing Darian Capers' separate issue of sentencing and then Ms. Christensen will be arguing the rebuttal. Judge, as it relates to our various different complaints, I would start out with the issues of the Brady materials. It's our contention that the government intentionally withheld discoverable information for the purpose of obtaining an advantage at trial. Is there any evidence in the alleged Brady violations that the jury did not hear at some point during the trial? Not to my knowledge and that gets to one of the problems in that we had discovered and through cross-examination of Mr. Hart and Ms. Ince and Ms. Murphy and Mr. Collada, all of these various issues. We had issues with Mr. Aldred, a fifth witness, and so of the 13 non-law enforcement witnesses that the government presented, we discovered five issues among those witnesses. What would you have done differently? One of the things that we probably would have done differently is that when the government says that they've made full disclosure, we would stop looking. One of the things we would do differently would be to continue to request for various police reports and other materials that should have been there and it appears were there. Specifically, the files that Mr. Shuler referenced about the Illinois State Police having, I believe it was the Illinois State Police, forgive me if it was a different agency, having records of the confidential sources. And how would that have affected the outcome of the trial? It would have affected our planning, it may or may not have affected our cross-examination, it may or may not have bled into the other aspects of the trial. And part of the problem with this is that there's no specifically measurable or quantifiable way to say that any one piece would have helped or would have hurt or anything like that. And that's part of the problem in that we know that as these issues just kept coming up during trial and kept drawing all the focus of the trial towards these discovery issues, they were pulling time and attention and resources away from the other aspects of the trial and preparation and things like that. I'm just not sure, I'm not quite sure that the government violated its disclosure obligations. For instance, the fact that Collada had sustained a head injury that affected his memory, that was new information to the government as well when it came out in trial. And you were able to so vigorously cross-examine and impeach the witnesses with their prior and consistent statements and grand jury testimony. So let's take Collada, I mean it would be very helpful for me to do this witness by witness and I had the same concern about Collada. The government represents in its brief that this was news to it too, so number one, there hadn't been a failure to disclose, and number two, considering that Brady is fundamentally a trial right, it's out at the trial. And so there's cross-examination, there's exploration of that, and the jury hears it all. So why is that a Brady violation on the government's part? Judge, I appreciate that you feel that we were able to vigorously cross-examine them, however... Well, I mean, so was Mr. Collada. Sure, as it relates to Mr. Collada, his testimony was that he had this car accident in the summer of 2011 to the best of his recollection, and then he began using crack cocaine and then he began involvement with these defendants, but the problem was that all of his memory was affected post-car accident, so from the summer of 2011 thereafter, and... So what's your evidence that the government knew about this car accident and the memory effects and failed to turn, or what is it that they failed to turn over to you? We believe that there are or should have been some sort of police report, some sort of documentation... But Brady is not an investigation command for the government, it's a disclosure command, right? We find it hard to believe that if Inspector Welgat met with Edward Collada a number of times for the interviews, let alone for the purpose of setting up these transactions and whatnot, he had... This was news to him when it came out, I believe, within two or three cross-examinations of the defense's case. It seems incredible. We don't have any report or any record that says the government didn't know that. I mean, that's simply just never going to happen. So I can't give you the answer I want or maybe that you want with respect to that, but it seems incredible that nobody from the government knew that he had a closed head injury when it comes out on Mr. Bell's cross-examination. So how clearly did you attack the government's good faith before Judge Darrow? Did you tell her they're lying when they say they didn't know or accuse them of that? It sounds like that's really what you're saying, that they were simply concealing and misrepresenting to the court what they knew, which is a very serious allegation, actually. Sure, and Judge, one of the easiest ways to get to the heart of this, there was an exchange between Mr. Tassif as he began to cross-examine Inspector Welgat, and this resulted in an extended sidebar. In the transcripts, it's from page 2588 through 2598. And during the course of that sidebar, Mr. Shuler is saying that he had disclosed and says that he's spoon-fed, and the court said they did. The issue came up at the pretrial conference, and I have what Judge Darrow said in the context or in the body of the brief, so I won't repeat it all, but she said they did ask for this stuff. And at the same sidebar, it was Mr. Bell who said that we don't have these reports. So contrary to spoon-feeding the defense that the government is claiming, what actually happened was that Officer Reed had testified first, and then, for example, Mr. Hart testified, and then the government blamed the defense for not properly impeaching Mr. Hart when the person who would have done it had already testified before Mr. Hart. But she gave you a chance to recall Officer Reed, did she not? She did. And what had happened was the government and the defense reached an agreement that Inspector Welgat would state that Mr. Hart, in fact, did receive benefits. And here again, part of the problem... I mean, because on the Hart point, if we're going to leave Collada for a minute, it was my understanding that the government did disclose well before trial the fact that he had been arrested and that he had the crack pipe and that he had not been prosecuted for that. That's the essence of the impeachment information that you wanted, and it was in your possession. Yes, they did disclose a letter to that effect, and then when Mr. Hart was on the witness stand, Mr. Hart denied receiving any benefits at all. And so as opposed to... But I'm saying you knew. In terms of the government's disclosure to you, what did the government do wrong? Mr. Hart may have been lying, but what did the government do wrong? When Mr. Hart testified falsely, we believe, the government made no steps to correct it. The government... But they'd already given you the report. No, they didn't. They gave us a letter which said... Well, they disclosed the information. Okay, so you're drawing a distinction between getting the actual arrest report and finding out the substance of the information in the letter? Correct. Because we can't impeach... Kind of a best evidence rule for Brady? Well, we can't impeach Mr. Hart through a letter written by an assistant U.S. attorney that says another officer has knowledge. But you could have asked Mr. Hart, you just said you didn't get any benefits, but isn't it true that you had a crack pipe and you weren't charged for having that crack pipe and you were released? You could have asked that question, highlighting the specific benefit that he received. Yes, we could have asked the question any number of different ways, and I believe all four counsel asked him about these benefits in other ways. And, again, it seems incredulous to believe that Mr. Hart didn't know exactly what was being talked about. And, in fact, Judge Darrow, going to opposing counsel's brief, opposing counsel says that at best this was an inconsistent statement, but that's not true. The court found that it was an inconsistent statement, and she didn't think that it rose to the level of perjury, but it was an inconsistent statement. And so, judges, I see my light is on. I would sit down and reserve additional time for rebuttal. Just with that, are there specific pieces of evidence or lines of argument about Hart's arrest and cooperation agreement that you were unable to present to the jury? I think that we were unable to present to the jury the timeliness as far as when he decided that he was going to cooperate with the government. I don't believe that we were adequately able to address if there was anything else aside from non-prosecution that he might have benefited from and things of that nature. Thank you. Thank you. All right, thank you. Mr. Bell? May it please the Court? My name is Murray Bell. I have the privilege of representing Mr. Capers in this case. We are talking about a sentencing issue today for Mr. Capers. This is a case of conspiracy that lasted approximately 36, 37 months. The four defendants went to trial were Brown and Coleman, who were basically the leaders and organizers, and Clark, who was of the same status perhaps as Mr. Capers, which was a runner or a middleman. Mr. Bell, the real crux of your argument seems to be that the district court was overly generous. I apologize. Oh, I'm sorry. The real crux of your argument is that the district court was overly generous in its calculations to the others, not that the court erred in calculating the amount of crack attributable to Capers, isn't it? Our position was that Mr. Capers was not responsible for 800 grams and that in thinking that the court was being conservative on all things, the court was not conservative. In fact, it was harsh to Mr. Capers. And the best example I can give you of that is this. The court found Mr. Capers fell within the 800-something grams to a fence level of 34. He was in the conspiracy for four months and maybe two weeks. Clark was in the conspiracy for 26 months. How would you propose calculating the quantity reasonably foreseeable to Mr. Capers for those four months? I do not think the court made a finding about reasonable foreseeable. No, but how would you propose calculating that amount? Well, I think it would be fair to calculate based on what he was involved in, but I don't know how the court can get to reasonably foreseeable, and therein lies the problem. Well, what is it that runners did for Mr. Coleman and Mr. Brown? What was the scope of their activity as a runner? They were making the actual deliveries. Mr. Capers was arrested with some bundles in his pocket. One bundle, and there was some testimony that the bundle was worth about $500. He had a bundle and then some cash, which calculated out to about, I think we figured it out to about 8 grams quantity, if you convert the cash to quantities. If you do that once a week, it was a weekend, if you do that once a week for 16 weeks, that's a lot less than 800. But that's the highest they ever had him with. Everything else was just witnesses saying, well, there was a lot of drugs being sold and so forth. The court landed on 150 grams per week being sold, but it didn't tell how much of that was foreseeable to Mr. Capers. So you would agree that the conspiracy itself for the 16 weeks that the court attributed to Mr. Capers was responsible for approximately that 2.4 kilos that's the extrapolated part. She's working from a one-year benchmark, and so it's 2.4. So to really zero in, she, in your view at least, doesn't explain well enough, although there's some conversation around it in this sentencing hearing, why the full amount the conspiracy is involved with is reasonably foreseeable to him. Doesn't she at one point, though, say that he was really right in the thick of things? This is more when she's discussing why it's acceptable to have a longer sentence for him than for Clark. Interestingly enough, that was in the Clark sentencing that that took place, I believe. Because she didn't know, the court didn't know what the sentence for Clark was going to be. At the time that the Capers sentence was held, Clark was looking at a mandatory life. It wasn't until the pre-sentence investigation report came out that they figured out that the three 851 notices, offenses, were all during the conspiracy and became relevant conduct, but not enhancers for mandatory life. How many other runners were working in the organization at the same time as Mr. Capers? See, I'm not able to tell the court that. The district court relied on the testimony of a person by the name of James Tatum and found that witness to be very credible. The problem was that witness was never in the conspiracy at the same time as Capers. So why isn't the analogy then, if Mr. Tatum's role as a runner was what Mr. Tatum described it to be, then that was likely then what Mr. Capers' role was, because they were doing it at different times. The question isn't whether that was his role, which is what you asked me. The question was, were the quantities the same at those times? That's the real nut of the argument. No, no, no, because the question is the role, because it's what's reasonably foreseeable. It's not the amount, but whether the full amount is reasonably foreseeable to Mr. Capers. And so if it was reasonably foreseeable to Tatum, why not Capers? Well, because we don't know how much Capers knew at the time. I notice I'm in my extra time. The most we ever saw Capers with was 8 grams. The most concrete or physical evidence they have against him is 15 grams. Everything else is on testimony of others. So my time is up. Thank you. So thank you, Mr. Bell. So I take Ms. Christensen's rebuttal, so it's your turn, Mr. Taddei. Good morning, Your Honors. May it please the Court, John Taddei for the United States. Focusing first on the issue of Mr. Capers' sentencing, which the Court was just getting into right now, the District Court did make an individualized finding with regard to Mr. Capers. Where can I find the reasonably foreseeable side of that? I've looked through the sentencing transcript a number of times, and I see people, particularly Mr. Bell, raising this as an issue. But I don't see the District Court ever tying it off and saying the conspiracy as a whole handled the 2.4 kilos during his six weeks, and all of it was foreseeable to him. Yes, Your Honor. Well, on sentencing transcript, page 264, the District Court indicates that the proper standard is to hold Mr. Capers responsible for, quote, the collective weight of the conspiracy that's reasonably foreseeable to the defendant. And the Court also indicates… She says, that's part of a question. She says, do you have any Seventh Circuit authority? Right. And so she, yes, the language you quoted is there, but it's a question. And then Mr. Bell answers it. Then they have a discussion for a little while about Elaine and other things. And I just can't find it tied off. Well, the reason why it's tied off there, Your Honor, is because it was in response to an argument by Mr. Bell that the only amount that was appropriate to attribute Mr. Capers was the amount that he was physically caught with, and then extrapolated out for the amount of time. Well, I understand the all-or-nothing approach has maybe some attraction, but the District Court has the obligation, does it not, to make a fact-finding on what's reasonably foreseeable to this defendant? And it did make that fact-finding, Your Honor. It doesn't necessarily have to be the full amount of the conspiracy. It could have been, you know, half, but it might have been an amount that took him into a different range for the guidelines. Yes, Your Honor, the District Court does have that obligation, and it's the government's position that it did make that specific factual finding to Mr. Capers. The court did not explicitly acknowledge that Capers could not be held responsible for any amounts distributed before the final four months of the conspiracy that I saw. Yes, it did, Your Honor, in that when it was conducting its calculations, it noted basically, if I could just work backwards, sort of from what the District Court did. The District Court, at the beginning of the hearing, made a determination about the amount of crack cocaine that could be attributed to the entire 36-month conspiracy, and it did that by first estimating in a very reasonable fashion that about $30,000 worth of crack cocaine was distributed per week, and then it broke that down into the amount of bundles and the value of bundles. So based on its calculations, it found that for the full 36-month period, about 150 grams were being distributed a week. Then what it did with respect to Mr. Capers is it indicated that he was involved in the conspiracy during a particularly successful time, and that he was involved for 16 weeks. It took that 150-gram-per-week figure, which was, again, a very reasonable estimate, and attributed that to Mr. Capers for the 16 weeks that he was involved in the conspiracy. That there, Your Honors, is an individualized assessment of Mr. Capers' involvement. But why does that address the scope of his jointly undertaken activity? Well, Your Honor, the way that it resolves the scope of his jointly undertaken involvement is the District Court also noted the number of witnesses that testified as to Mr. Capers' involvement, and that begins on page 267 in the transcript. What did she mean by it? Here's something that troubled me. At sentencing, she said that there were, quote, a few different theories why the full weight of the conspiracy should be attributable to Capers. Your Honor, I think that was a reference to the fact that, as Mr. Bell just indicated, he was involved for 4 months and 2 weeks, which is about 16 weeks or so, a larger amount of time than he wound up actually getting credit for, which was a 16-week period. That's what she meant with that statement. But see, I have that statement flagged as well on page 270. And again, she leaves it up in the air. She says, I think that there's a few different theories to argue why the full weight of the conspiracy would be appropriate to attribute to Mr. Capers, but I don't think it's necessary. Well, I don't know which means it's. I still think he's appropriately at a level 34, and then she just kind of goes back to the answer, not the reasoning. Yes, I have that transcript in front of me as well, Your Honor. It's very frustrating. Yeah, and taking a look at that, I think it's important to consider the full context of what was going on here. You have 2 defendants that were being sentenced prior to this, and they were defendants who were subject to mandatory minimums. So the court took a little bit of a shortcut with respect to their sentencing and said, we're only going to give you credit for 12 months of your involvement in this conspiracy. That gets you to the 840 to 2.4 kilogram threshold, but in any event, they're sentenced under a mandatory minimum, and that's their sentence. The real individualized assessment was with respect to Mr. Capers, because he is the one that's being sentenced under a guidelines range here. And the court, indicating that it believes a greater amount may be appropriate, and it could have been a variety of factors for that. One is that it could have been the longer period of time that he was likely involved in the conspiracy, instead focusing just on the 16-week period. Can I ask you another question? Is there language in the pre-sentence investigation report that would explain why the full amount of the conspiracy for that 16 weeks is reasonably foreseeable? Yes, Your Honor, there is. It goes through sort of an individualized discussion of the testimony that was given against Mr. Capers, and if I may, and with reference to the trial transcript as well, just a few examples. Loretta Ebsen indicated that she bought 25 to 30 times from Mr. Capers. That's on transcript page 402. She also indicated that she witnessed Mr. Capers bag drugs with Frederick Coleman and Jerry Brown. Mr. Capers was arrested in her home with 5.7 grams of crack, $1,400, and one of the cell phones, one of the key items that the conspirators used to call in amounts. Other witnesses testified similarly as to Mr. Capers' involvement in every scope of this. He wasn't just a runner. So the reason I'm asking this is the paragraph that follows the one that we were just talking about on 270 begins with, so based on that, the court takes the probation's position. So I understand that to mean she agrees with whatever was said in the pre-sentence report. Yes, Your Honor. So that's why I'm just wondering whether that bails you out at all. Well, I think, Your Honor, the most important thing to consider here is that Mr. Capers was not just some corner boy or some runner that was isolated from the upper echelons of this organization. He was intrinsically involved in every aspect. He bagged drugs with these people. He drove up to Chicago. These people means? Frederick Coleman and Jerry Brown. Coleman and Brown. Exactly. James Tatum testified that Mr. Capers was his replacement. That's on page 2049 and 50. And if Your Honors recall, Mr. Tatum once sold $9,000 of crack cocaine in a single day. Heather Murphy testified that she saw him bagging drugs with Frederick Coleman and Jerry Brown. Also indicated that she went with Mr. Capers and Jerry Brown to acquire crack cocaine from Chicago. So he was aware and intrinsically involved in every aspect of the conspiracy for the 16-week period which he was involved. And that's what the court means when it says it's appropriate during that 16-week period to attribute the full amount. But let me get back to one point that you're… Yes, Your Honor. Would you agree that he is the only defendant who didn't get the benefit of what, you know, you would call a very conservative calculation by the district court? Well, I think Mr. Clark also got a benefit to some degree as well in that he was sentenced to a below guidelines range sentence. He got the safety valve, right? Yes, Your Honor. There's a reason for that. I mean, he's on his own. Yes, Your Honor. Well, the important thing here again, and I think I made reference to it prior to this, was that with respect to Mr. Brown and Mr. Coleman, the court knew that it was sentencing these individuals as mandatory minimum sentences. So it did take a shortcut with respect to them. But that argument that perhaps they received a benefit that Mr. Capers did not receive, that's more akin to a 3553A6 argument, that there's a disparity between the amount of drugs that was attributed to each defendant. That is an argument that's not really raised with respect to Mr. Capers. The important focus here is that he was sentenced as an individual. It doesn't matter that the court took a shortcut with respect to those other two individuals. What's important is that the court looked at the testimony at trial that said Mr. Capers was a big player in this drug conspiracy for the 16 weeks involved. And the point that I was about to mention prior to this was that I believe one of Your Honors said, why didn't they have it? Why didn't they take a smaller amount? Even if the court halves the amount of drugs here, you still wind up with above 840 grams attributed to Mr. Capers. You wind up with 1.2 kilograms. So even if that factual finding was clearly erroneous, you still wind up with an amount that's well beyond the minimum for an offense level of 34 in this circumstance. The problem is we're doing all this extrapolation from not much specific assistance from the district court judge. Maybe we're reading her mind properly, and maybe evidence was there, but the question whether there's evidence there to support a conclusion is different from whether she had to come to that conclusion. District courts have a lot of discretion to weigh these things, especially when they're in the estimating game and trying to patch all this information together. We don't know that she would have come out the way you're saying. Well, I think we do based on the fact that one, in response to Mr. Bell's argument that he should only be attributed the amount of drugs that were actually in his pocket, and then responding no is the proper standard, the collective weight of the conspiracy that's reasonably foreseeable to the defendant, and that's that rhetorical question on 264. The court, by asking that question, indicated that it was implying that that was the right answer, and then that's what it did by making reference to the full panoply of witnesses who testified about Mr. Capers' tremendous involvement in this conspiracy, and in addition to that, the court also noted that its estimates were very conservative. Mr. Capers was responsible for likely an amount that was well beyond 2.4 kilograms, but instead it settled on that by fixating only on the 16-week period and by applying a very reasonable estimate for the amount of drugs, and that's a standard that this court has applied again and again. This is an art, not a science, as this court has held in the United States v. Block. Well, sure, the calculations don't have to be precise, but how can it be simultaneously true that over a three-year period you've got the three of them, you know, well, four, the other one, responsible for, you know, between 840 grams and 2.8 kilos, and he's responsible for that same amount over a period of four months? It just seems so unjust, doesn't it? Well, no, Your Honor. No, of course not. You're the government evidence. Again, Your Honor, the court question is whether this was an individualized assessment, and the court reviews that individualized assessment of the drug amount attributed to the defendant for clear error, and the government's position is when you consider the fact that the court was applying a reasonable foreseeability standard, it was taking an amount of drugs, which was a conservative estimate of that, and applying it to the period of time that the defendant was involved, that that can't possibly be a clearly erroneous application of the guidelines there, and as a result, the sentence was proper. Unless Your Honors have any other further questions on the sentencing issue, I'll move on very briefly to the Brady issue. And with respect to the Brady issue, and I think the panel was getting to this from a number of angles, if you look at the four particular witnesses that the government has alleged to have violated Brady, and again, the government takes its Brady obligations very seriously, and I don't need to tell the panel that, but with respect to all of these individuals, either the information was disclosed or there's no evidence that's provided by the defendants to indicate the information wasn't disclosed, or it came out for the first time at trial. With respect to Mr. Hart, again, the information that he was arrested for possession of a crack pipe prior to cooperation and was not charged was divulged in a giglio letter seven months prior to trial. The defendants had that in their hand and was certainly what they were looking to when they were obliquely trying to impeach Mr. Hart by asking him amorphous questions about benefits. Now, Mr. Hart... Now, is there any way they could have gotten the original arrest record in that? I mean, they did get the letter, saying, here's what happened. And they're saying, no, actually, the letter isn't the kind of thing that would really be useful to us. Was it their burden, then, to go find the arrest record? Well, Your Honour, there's no requirement for the government to turn over arrest records with respect to its Brady and giglio obligations. Brady is a disclosure obligation. It's not a discovery obligation. And here, as occurs in thousands of cases across the country every day, the government supplied that full and complete information in a letter in which it turned over that Brady information. And it was a copy of the information that was contained in that police report. There's no allegation otherwise. And they had full possession of that information. It was within their power to impeach Mr. Hart directly with that information, but instead they chose to sort of attack it from the side and ask him amorphous questions about benefits. And Mr. Hart very possibly didn't consider benefits in his head when he was on the stand. Maybe he thought benefits meant money. Maybe he thought they meant something else. But even beyond that, Your Honour, what's important here is when defendants failed to elicit that information from Mr. Hart, the government itself elicited that information during the examination of Inspector Welgott. They asked him, you know, was this person pulled over for a crack pipe? He said yes. Was he charged? No. And then he was also... Inspector Welgott was also cross-examined on that information. So not only was the information not suppressed and that it was turned over prior to trial, it was subject to full and complete cross-examination. And in addition, the defendants focused on it during their closing arguments. Can I ask you about Ince? Oh, Ince. Yes, Your Honour. So her testimony at trial is that she buys 100 times. Yes. When her prior testimony was five times. And I gather that the government did not disclose to the defense that Ince was now going to be testifying that it was 100 times, and that that inconsistency in her testimony was not previewed to the defense. My question is, why not? Well, the inconsistency actually was previewed and was turned over. If you look at transcript page 2580, which is the cross-examination of Inspector Welgott, or excuse me, it's either the examination or cross-examination, I can't quite remember exactly which one it is. Inspector Welgott indicates that he put that five times amount in his report, and it was turned over. So it was news. But was the 100 times turned over? Inspector Welgott was not aware prior to trial that Ms. Ince would testify at trial that it was 100 times. Presumably the AUSA was. I don't believe so, Your Honour, and there's no indication that that was the case in the record.  and it was turned over, both the grand jury testimony and the report indicate that Ms. Ince testified that she had bought from Frederick Coleman five times and then at trial she said 100 times. There's no indication in the record that either Inspector Welgott or the AUSA were aware that that five number would turn into 100 when it came time for trial testimony, and in fact, Inspector Welgott, I believe, testified at trial that he was surprised as well and that report had been turned over. But the most important thing above all is that this information did come out at trial and it was a feature not only of the cross-examination but was also a feature of closing arguments by the defendants again, talking about how Ms. Ince was not credible because she had been inconsistent. Heather Murphy has a similar circumstance as well in that during the grand jury testimony she stated that she first bought from Tatum and then at trial she said she first brought from Brown. There was no suppression in that circumstance as well because Inspector Welgott testified that he had written a report that reflected that inconsistency. So that was a situation where it appeared that Inspector Welgott had been aware and had written a report that reflected it, which was turned over to defendants, and they had the full and fair ability to investigate that report and cross-examine on its basis, which they did as well. It was also a feature of closing arguments. So in all of these circumstances, Your Honor, this information not only came out at trial, it was subject to full and fair cross-examination or prior to trial, excuse me. It was subject to full and fair cross-examination and in many circumstances was a feature of the closing arguments of the defense. So there was no suppression and they certainly were not prejudiced by it as a result of their ability to ask questions. Did the government object to having the defendant's call officer read back to the stand so that they could question him about the circumstances of Hart's arrest or did the defense simply opt not to re-question him? I believe the government did object, Your Honors, but in any event, the objection was overruled and the defendants were given the opportunity to recall Mr. Reed, and the government also indicated that it would make Officer Reed available for cross-examination. And the reason why the government objected is the government didn't believe it was necessary to call Inspector Reed. The information that Mr. Coleman had been arrested with a crack pipe and not charged with that had already been turned over. It had already been testified about with Inspector Welgot. So basically this was just the defense trying to get a second shot at Officer Reed. In any event, they were given the opportunity to do that and they waived that opportunity. They did not call Inspector Reed despite the opportunity to call him. Unless Your Honors have any further questions, the government will rest on its brief. Thank you. Apparently not. Thank you very much. Ms. Christensen. I will focus on the Brady issue since that's been the focus of argument. We're certainly not giving up on our Western Union issues, but for the interest of time, we'll talk about Brady. I do have to immediately disagree with the government. It was actually seven witnesses that we raised in the Brady portion of the brief. It's John Hart, who we've talked about, Heather Murphy, Jennifer Ince, Ed Collada, then Shawn Swearingen, who testified as to threats made by the defendants to him, Clayton, Tanya Clayton, and then Melinda Blanks. So it was seven witnesses. What's the exculpatory information from the Swearingen? It's not exculpatory. It's a threat that Brown and Coleman made against him to hurt him and his family. That was not disclosed. So how is that Brady material? It certainly was part and parcel of the government's not turning over statements, and it was defendants' statements that they had not turned over. That sounds more like Jenks. It could have been raised... All these issues were kind of balled together, as it were, and raised... We have raised it under a Brady issue, but you're right, it's probably a Jenks issue. But I think the bigger picture here is that this happened with nearly every lay witness or non-law enforcement witness, that there was something that came up during cross-examination that the defense attorneys didn't know. And our concern about the court's potential ruling on these issues is that there's some sort of you-have-a-good-attorney exception to Brady. So if you have an attorney who's able to think on their feet and remember all the thousands of pages of discovery and audio recordings and video and pictures and think, oh yes, that thing, that thing is wrong, and raise that on cross-examination, you don't get to prevail, and the government gets a pass on Brady violations, because we were able to use it in cross-examination. I'll give you another two minutes, because we asked a lot of questions. Oh, I apologize. No, no, no, you can finish your talk. That's our main concern, because it does turn into this exception that if you have a good attorney, government gets to be a little more loose with Brady. If you don't, and you can't rebut that, then it becomes a Brady error. It should not be on defense counsel to solve those issues. I'll correct the government one about Welgat as well. The Officer Reed and then Officer Welgat situation, the government and the defense attorneys agreed that the defense would not recall Reed because Welgat could bring the information forward that Reed was going to bring forward. And then it became very obvious at the beginning of Welgat's, I believe, cross-examination that he was not able to do that. So it wasn't necessarily that we just flat-out said, oh, no, we won't recall Reed. It was a government agreement with us to do what we needed to do through Welgat, and the government said we could do that. So unless the court has further questions, I will let Mr. Bell take over. Thank you. All right, fine. Thank you. Thank you. May it please the court. I find myself in an unusual position. Unlike at home with my lovely wife, I get the last word. Be careful, Mr. Bell. Yes, be careful. I see. You are outnumbered today. That's enough of you. I want to address the court's statement about it. It just feels unjust. And the court's statement about the district court thought that it could hold Capers responsible for the entire amount of the conspiracy. This goes to the disparate sentencing question. The court applied 150 grams a week to Mr. Capers for 16 weeks and came up with 2,600 grams. Had she applied the 150 grams a week to Ms. Nicholas Clark, I calculate 111 weeks, I calculate 16 kilos, 16,770. Now, I know that makes Mr. Destler back there a little nervous. He represented Clark. But how does he end up with a less sentence than my client? If that were the correct calculation, he would have had a fence level of 38. Even with the two level off for the safety valve, he would have been at 36. His bottom of the guidelines would be at the top of Mr. Capers' guidelines. Okay, I think we have your point. Thank you very much. Thanks to all counsel, and we appreciate, in particular, those of you who were court appointed for accepting the appointments. It's a great help to the court. And thanks as well to the United States.